## THE COUNTY COMMISSIONERS OF LUCAS COUNTY *v.* JOHN E. HUNT AND OTHERS.

Where the seat of justice of a county is located at a particular place by authority of law, upon condition that citizens interested in the location would erect there, and donate to the county, a court house and public offices; and such citizens comply with such condition; and the seat of justice is afterward removed to another place, and the county commissioners still claim the right to use and dispose of such public buildings for other purposes than those for which they were erected and donated; and the donors afterward prefer claims before the board of county commissioners, for the money expended in the erection of such public buildings, with interest; and the county commissioners, to compromise these claims, authorize county orders to be issued to the donors for the amount of the original advancement, provided the donors throw off the interest thereon, and release the county from all claims on account of such donations; and the donors accept the offer, and execute the release, and the county orders issue. On bill, filed by a new board of commissioners, to enjoin the payment of the county orders, Held:

1. There was a clear moral obligation on the part of the county to either give up the property or make compensation, after the county seat was removed.
2. Doubts might well be entertained whether chancery would not have interfered on behalf of the donors.
3. The claims of the donors were of that kind of doubtful character in equity, which would raise a sufficient consideration for a compromise; and that, therefore, this court ought not to interfere by injunction, to save the county from the payment of a demand having the sanctions of moral obligation.

In chancery.   Reserved in Lucas county.

This is a bill in chancery, filed by the county commissioners of Lucas county, to enjoin the payment to defendants, of county orders of Lucas county to the amount of nine thousand twenty-nine dollars and ninety-nine cents, issued to them by the predecessors of the board of commissioners filing said bill.

The material facts in the case are the following :

For a number of years previous to 1840, much difficulty had existed in Lucas county in regard to the location of the county seat of that county, and for the purpose of finally quieting those difficulties, the legislature of the State of Ohio, on the 23d day of March, A. D. 1840, passed a resolution in words following, to wit :

" *Resolved by the General Assembly of the State of Ohio,* That James Culbertson, of Perry county, Joseph Burns, of Coshocton county, and Joseph McCutchen, of Crawford county, be and they are hereby appointed commissioners to review the seat of justice of Lucas county, and, if in their opinion the public interests require it, to re-locate such seat of justice at such point in said county of Lucas as they may deem most in accordance with the public convenience ; and said commissioners shall be governed in all their doings by an act passed February 3, 1824, establishing seats of justice."

In pursuance of this resolution, said commissioners entered on the performance of the duty assigned them, and on the 29th day of May, A. D. 1840, gave it to be understood that they would locate the seat of justice of said county on Washington Square, in Maumee City, on condition that the people of Maumee City, and others interested in its location at that point, would erect a court house and offices for the use of said county, according to plans to be furnished by the commissioners, at a cost not exceeding ten thousand dollars.   In accordance with which understanding, John E. Hunt and others, on said 29th day of May, A. D. 1840, executed to the commissioners a bond in the penal sum of twenty thousand dollars, to comply with the terms above stated. On receiving this bond, the commissioners did locate the seat of

justice of Lucas county at Maumee City. Very soon after this location, the defendants subscribed a sufficient amount for the construction of said court house and offices, as specified in the bond of John E. Hunt and others to the commissioners, and on the 8th day of October, A. D. 1841, the county commissioners of Lucas county receipted the bond of John E. Hunt and others as having been complied with. On the 14th day of February, A. D. 1843, some question having arisen as to the right of the commissioners to make this location, the general assembly of the State of Ohio passed the following act:

" WHEREAS, by a joint resolution of the general assembly, commissioners were appointed to review and re-locate the seat of justice of Lucas county ; and whereas said commissioners did locate and establish said seat of justice at Maumee City, in said county; and whereas, pursuant to stipulations entered into by sundry citizens of said Maumee City, public grounds have been appropriated, and a court house and offices of the value of twelve thousand dollars have been built by said citizens as a donation, on condition that said seat of justice be permanently established at said Maumee City, and which have been accepted by the commissioners of said county ; and whereas doubts have arisen as to the legality of the acts of said commissioners under said resolution ; therefore,

" SEC. 1. *Be it enacted by the General Assembly of the State of Ohio*, That the seat of justice of the county of Lucas is hereby declared to be *permanently located* at Maumee City, in said county, where the court house now stands, and at the place designated by the commissioners appointed by the legislature in A. D. 1840, to review and re-locate said seat of justice."

After the passage of this act, the seat of justice was considered on all hands as being permanently located at Maumee City ; but, at the annual fall election, A. D. 1852, said seat of justice, by a vote of a majority of the citizens of Lucas county, was removed to the city of Toledo, in said county of Lucas, by virtue of another act of the general assembly of the State of Ohio, said act making no provision for compensation to these defendants in case

of the removal of said seat of justice, nor for the restoration to defendants of the buildings by them erected, or of the lots on which the same stood. After the removal, the defendants appeared before the county commissioners, and claimed from them the amount of the original advancements, with interest, on the ground of the failure of the original consideration on which the same was advanced; and, on the 1st day of November, A. D. 1852, the county commissioners, at a special session, at which all the commissioners were present, two of them (being a majority) passed a resolution, that if said contributors would release the county from all claims on account of their said contributions, they, the said commissioners, would allow them orders on the county treasury for the amount which had been actually contributed by them, without interest. In accordance with said resolution, the required release was executed, and orders were issued by the auditor of Lucas county to each of said contributors for the amount so by each originally advanced, without interest. On the 26th day of November, A. D. 1852, there was a change in the board of county commissioners, and this bill was filed to enjoin the collection of the orders so issued, under the authority of the resolution of the former board. On the 2d day of September, A. D. 1853, two of said county commissioners (one of whom is the commissioner who swears to the bill in this case) served notice on an occupant of this court house to recover possession of it.

The depositions of two of the members of the board of county commissioners, in November, 1852, were taken in regard to the call of the special session mentioned, and the circumstances attending the passage of the resolution.

Under this state of facts, the question presented is, shall this bill be sustained?

*Fitch & McBain*, and *Bassett & Kent*, for complainants.

*Bassett & Kent*, in argument, submitted the following propositions:

I. That these defendants had no *legal* claim against the

county which could furnish a consideration for the  orders sought to be enjoined.

The resolution of the  general assembly, passed March 23d, 1840, did not make the  re-location permanent ; neither did the act of February 3d, 1824, by which the  commissioners were to be " *governed in all their doings.*"   Neither did this resolution, or the act of 1824, authorize the commissioners to make any conditions for the location of the seat  of justice ; but they were to locate it where the public convenience required.   ·

The subscription made on the  21st day of May, 1840, says nothing about a *permanent location.*   It was upon  condition that the county seat be located within the limits of Maumee City.

The bond of Hunt and others, conditioned for the erection of the county buildings, is attached to the answer, and we can find nothing in it that would show that the obligors claimed that they were procuring a *permanent* location of the seat of justice.

The  court house was  completed and accepted, October 8th, 1841.

This executed the gift, and the donors had obtained all that they had a right to expect—the location of the  seat  of justice, under a general law, subject to be altered  or  removed  again at any time the legislature might see fit.

February 14th, 1843.   An act of the legislature was passed, permanently locating the seat of justice at Maumee City.

Thus, sixteen months after  the  gift had  been  fully executed and accepted, is the first  that we  hear  that the location was to be *permanent*.

II.   But it is said, that if there was no legal obligation on the part of the county, there was a *moral* one, and that this is a sufficient consideration to support a contract.

We know that it has sometimes been loosely said, that a moral obligation furnishes sufficient consideration for an express contract ; but this rule, wherever it has been presented to courts for adjudication, has been limited to one class of moral obligations —that is, to cases where there has been some  preëxisting  legal obligation—which has become inoperative by positive  law ; such as  a subsequent promise to pay a debt barred  by the statute of

limitations.   The rule is well stated and discussed in *Mills* v. *Wyman*, 3 Pick. Rep. 207, where C. J. Parker limits its operation to the cases we have stated.   To the same effect, is *Geer* v. *Archer*, 2 Barbour S. C. Rep. 424, and we believe all other cases where the point has been expressly decided.

But we deny that there was any claim upon the county—legal, moral or equitable.   What moral claim had these speculators in city property at Maumee, after they had induced the commissioners to locate the seat of justice so as to enhance the value of their property, if, after the people of the county had suffered the inconvenience for some dozen years, the public convenience so absolutely required its restoration to its former location, that these men had no longer the power to hold it ?   The money they subscribed was not given to the county.   They built the court house and gave that to the county, and if this donation had been made upon condition that the county seat should be permanent there, they could not ask the county to repay them their money. The consideration of their conveyance would then have failed, and they could have taken their property again.   But the consideration has not failed.   They have had all they bargained for, the location of the seat of justice, and if it did them any good, they have had the benefit of it ; and if it did them no good, they simply made a bad bargain, and they have no claim upon any one—*moral* or *equitable*—to make up the losses of their unprofitable speculation.

But we are told, that there has been a compromise, and courts will not go behind that, to see which party had the stronger right.

We, however, beg leave to submit—

III.   That these orders cannot be supported on the ground that they were given to compromise a doubtful claim against the county.

1. There was no *doubtful* claim to be compromised.

In *Longridge* v. *Dorville*, 5 B. and Ald. 117, it was *held*, " that the giving up of suit instituted to try a question respecting which the law is doubtful, is a good consideration for a promise to pay a stipulated sum," and this we do not dispute to be

good law. But the party to whom the promise is made, must have a claim, it may not be a claim where he could absolutely recover, but it must at least be one where it is doubtful whether the other party could resist it. In *Edwards* v. *Baugh*, 11 M. and W. 641, Lord Abinger says : " The declaration only alleges that certain *disputes* and *controversies* were pending between the plaintiff and defendant, whether the defendant was indebted to the plaintiff in a certain sum of money. There is nothing in the use of the word ' *controversy*,' to render this a good consideration. The controversy merely is, that one claims the debt, and the other denies it." See, also, the case of *Wade* v. *Simeon*, 2 C. B., as quoted in 1 Parsons on Contracts 366. See, also, Story on Contracts, sec. 436, and the cases there cited.

2. There was no agreement to compromise.

What did the defendants surrender ? If counsel on the other side will show the court, they will do more than we have been able to discover from the proof. It seems to us, that these orders were given as a mere gratuity, on the defendants presenting their *moral* claim.

IV. The commissioners had no power to act, except at a regular session.

The statute in force at the time, was the act of June 1, 1831. Swan's Statutes 1841, p. 205. See *Archer* v. *Com. of Allen Co.*, 3 Blackford Rep. 501. This decision was made under a law of Indiana similar to ours.

*Young & Waite*, and *Spink & Murray*, for defendants.

*James Murray*, for defendants, argued in substance as follows :

I. In regard to the power of the county commissioners to act, except at a regular session.

1. The law has made it obligatory on them to hold certain stated sessions ; but, at the same time, has nowhere limited the discretionary power which they possess of holding special, *in addition* to stated or regular sessions. We are satisfied that the law never intended to restrict the inherent power which the board

of commissioners would otherwise possess to meet at irregular times for the transaction of business.

2. If the court should find that this board of county commissioners had power to execute a contract of this kind; that they did execute it, although at an improper time; that that contract was made in good faith, on sufficient consideration, and with a full knowledge of all the facts; is there any equitable principle upon which these complainants can sustain a bill in equity to *revoke their contract*, because it was made by *them* at an improper time? We think there is none.

It may be urged that such a contract could not bind the county. We reply, that whatever might be the result under some circumstances, it can never be claimed that relief could be had against it in that court, whose first principle is, that " he who seeks equity, must do equity." If they are equitably bound to make this contract, *and the county which they represent is equitably bound to ratify it*, they certainly cannot set aside their contract for the reason they have alleged. It would be a violation of the equitable rights of the defendants.

II. The county was liable to respond to these defendants in damages; yet even admitting the liability of the county to have been doubtful, we conceive no proposition can be clearer than that if such liability was a doubtful one, a promise to pay, on a compromise of the claim made in good faith, without fraud, and on a full understanding of all the facts, will be enforced. *Taylor* v. *Patrick*, 1 Bibb Rep. 168; *Perkins* v. *Gray*, 3 S. C. Rep. 331; *Logan* v. *Matthews*, 6 Barr Rep. 417; *Zane* v. *Zane*, 6 Munf. 406; *Fisher* v. *May*, 2 Bibb 448; *Mills* v. *Lee*, 6 Monr. 97; *Kennedy* v. *Davis*, 2 Bibb 343; *McKinley* v. *Watkins*, 13 Illinois Rep. 140.

And it will make no difference, even if the court should find that the county was not legally liable to pay the claims of defendants. As was well said in *Ohio* v. *Piatt*, 15 Ohio Rep. 23, " The board of commissioners are the general agents of the county—they are the proper persons to sue in behalf of the county—liable to suit, and in their representative capacity responsible for the result of such suits." If this be true, then it

seems most clear that the *power to sue, and the liability to be sued, must carry with it, the inherent power to settle and compromise such suits.* There can be no true rule in regard to the authority of the commissioners to compromise and settle, except the judgment of the commissioners as exercised in good faith at the time.

We claim that there was on the part of the commissioners of Lucas county, a moral obligation to repay to these defendants the amount by them advanced for the erection of the court house and offices, and the lots of ground on which the same stood. That such moral obligation is a sufficient consideration for an express promise, is well settled by the decision in *Reed* v. *McGrew,* 5 Ohio Rep. 375; *Commissioners of Canal Fund* v. *Perry,* 5 Ohio Rep. 58; *Barlow* v. *Smith,* 4 Vermont Rep. 144.

J. R. SWAN, J.

There is not proof of collusion or unfairness used to obtain a compromise of the claim of the defendants upon the county. The object of the donations of the defendants to the county, was to procure the county seat to be located at Maumee. It could not have entered into the contemplation of the parties, that the county seat, after being once established at Maumee, would, in the course of years, be removed. It was, however, removed, and the county, notwithstanding, claimed the property of defendants, and the right to use and dispose of it for other purposes than those for which the defendants were induced to give it. Whatever may be the legal rights of the county under such circumstances, it is unjust and inequitable on its part to retain this property, after having deprived the defendants, substantially, of the consideration which induced them to give it. There was a clear moral obligation on the part of the county, to either give up the property, or make compensation after the county seat was removed; and respectable members of the bar and court might well have entertained doubts whether chancery would not have interfered on behalf of the defendants. Under these circumstances, we are of the opinion that the claim of the defendants was

DECEMBER TERM, 1856. 497

The State, ex rel. Huston et al. *v.* The Comm'rs of Perry County.

of that kind of doubtful character in equity, which would raise a sufficient consideration for a compromise; and that, therefore, this court ought not to interpose by injunction to save the county from the payment of a demand having the sanctions of moral obligation.